IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DIANE G. REED                    §
                                 §
VS.                              §    CIVIL ACTION NO. 4:02-CV-188-Y
                                 §
CITY OF ARLINGTON                §

ORDER PARTIALLY GRANTING
AND PARTIALLY DENYING MOTION TO DISMISS

The City of Arlington ("the City") has filed a motion (doc.
#210) asking the court to dismiss[1] this case and enter a take-
nothing judgment in its favor on the ground of judicial estoppel.
Former plaintiff Kim Lubke sued the City for violations of the
Family Medical Leave Act ("FMLA"). He won a judgment in excess of
one million dollars. The City appealed and, during the appeal,
Lubke filed for Chapter 7 bankruptcy but failed to disclose his
judgment against the City as an asset of the estate. Lubke
received a no-asset discharge from the bankruptcy court and the
case was closed.

Once Diane Reed, the trustee for the bankruptcy estate,
learned of the unscheduled judgment, she had the bankruptcy
reopened, the discharge revoked, and had herself substituted into
this litigation to pursue the judgment on behalf of the bankruptcy
estate. She hoped to collect and distribute the proceeds to
creditors who have filed their claims after being notified that an

_____

[1] The City actually filed a motion for summary judgment based on judicial
estoppel. Because the City's motion does not call upon the Court to render
judgment on the merits of this case, but rather to dismiss this case on the basis
of the judicially created doctrine of judicial estoppel, the Court construes the
City's motion as a motion to dismiss.

asset of the bankruptcy estate had been recovered that may result in their receiving payment.

The City's motion presents the difficult question of whether, because of Lubke's failure to promptly and properly disclose the judgment when he filed for bankruptcy, the Court should judicially estop the bankruptcy estate from pursuing and collecting on the judgment against the City. The effect of such an estoppel would be to prevent creditors from receiving any distributions from the once again insolvent bankruptcy estate. After review, the Court concludes that Lubke should be estopped from receiving any benefit from his judgment but that the bankruptcy estate should not be estopped from pursuing or collecting on the judgment.

I.    Factual Background

Kim Lubke was a twenty-two year veteran of the City of Arlington Fire Department when he was terminated on April 19, 2000, in violation of the FMLA. Lubke filed suit against the City and, following a ten-day trial, was awarded a judgment in excess of one million dollars for lost wages and benefits, liquidated damages, attorney fees, and court costs. The City appealed the judgment on September 29, 2004.

While the appeal was pending before the court of appeals, Kim Lubke and his wife, Debbie, filed for bankruptcy under Chapter 7 of the Bankruptcy Code on June 10, 2005. The Lubkes did not disclose

this lawsuit or the judgment on their bankruptcy schedules. They also failed to make other pertinent and required discloses. They failed to disclose an oil and gas lease they had on their property;[2] they failed to disclose their ownership of five goats; they failed to disclose a flea-market business they conducted in Canton, Texas, the inventory for this business, and any of its assets; and they failed to disclose all of the businesses they engaged in and trade names they had used during the past six years.[3] The Lubkes received a no-asset discharge and the bank-ruptcy was closed in September 2005.

On June 30, 2006, the court of appeals affirmed in part and reversed in part the judgment of this Court. *See Lubke v. City of Arlington,* 455 F.3d 489, 500 (5th Cir. 2006). The court of appeals agreed that the City violated the FLMA but reversed the award of damages and remanded the case to this Court for further proceedings to recalculate damages. *Id.*

Thereafter, the City and Lubke entered into settlement negotiations. On July 31, 2006, the City communicated an offer of

---

[2]  At the hearing on this motion, it was revealed that a number of years before the Lubkes filed for bankruptcy, they had been paid approximately $500 for an oil and gas lease on their property. It was also revealed, however, that the Lubkes had not been paid any royalties from the lease and, other than the $500, had not received any compensation from the lease.

[3]  The testimony at the hearing revealed that the Lubkes had a lawn-mowing business that had closed down a year or so before they filed for bankruptcy. Although the business was no longer operating at the time they filed for bankruptcy, the bankruptcy forms clearly required the Lubkes to list all of their businesses for the past six years. There was also some evidence that the Lubkes may have been in the farming business during the six years prior to their bankruptcy but, again, by the time they filed for bankruptcy, the business was no longer operating.

judgment under Federal Rule of Civil Procedure 68 to Lubke's attorney, Roger Hurlbut.[4]  Hurlbut called Lubke to inform him of the City's offer.  According to Hurlbut,

> [W]e were having a conversation and we were
> discussing, as I recall, Rule 68, which ap-
> plies to offers of judgment.  In that conver-
> sation, Mr. Lubke indicated to me that he was
> having difficulties and we were discussing how
> much of a hard time the city had given us
> procedurally and throughout this whole case,
> and, finally, we were getting somewhere to
> resolve it.  And he indicated that he had
> contracted . . . Bell's Palsy at the time.  He
> also told me he filed bankruptcy.  And I said
> Kim, what?  What in the heck are you talking
> about.  He said we filed bankruptcy last
> summer.  I said, wait a minute.  Did you have
> a bankruptcy attorney I didn't know his name
> he said it was Michael Rogers.  I said, well,
> he didn't call me.  I said did you in-
> clude—was he familiar with the lawsuit and
> the judgment we got against the city.  He said
> yes.  And I said well why was I not contacted?
> Why was I not included?  He said the bank-
> ruptcy attorney told him it did not have to be
> included in the bankruptcy because it was not
> within the time frame of 12 months prior to
> filing the bankruptcy.  But he said if I ever
> came into any money within like six months of
> the bankruptcy, that he was to inform the
> bankruptcy trustee and the Court.

---

[4]  Hurlbut had represented and continues to represent Lubke in regard to his FMLA case against the City.  Hurlbut did not represent Lubke at his initial bankrutpcy.

(Tr. at 58-9.)[5]

The news of the Lubkes' bankruptcy came as a surprise to Hurlbut. Sensing Lubke had received bad advice, Hurlbut began to investigate the matter, and he concluded that the bankruptcy trustee needed to be contacted and that the judgment needed to be disclosed as an asset of the bankruptcy estate.

Hurlbut determined that Diane Reed had been appointed trustee of the bankruptcy estate. He immediately notified Reed's attorney of the judgment and the offer from the City. Pursuant to an agreed motion between Reed and Lubke, the bankruptcy court reopened the Lubkes' bankruptcy case on August 10, 2006. On that same day, Reed filed a motion with this Court to substitute herself as the real party in interest and she sent the City her written acceptance of the City's offer of judgment under Rule 68.

In conjunction with reopening his bankruptcy case, Lubke filed amended bankruptcy schedules disclosing his suit against the City and his judgment. Lubke, however, still failed to make the other pertinent and required disclosures discussed above.

---

[5] Lubke's bankruptcy attorney, Michael Rogers, denied that Lubke ever mentioned the judgment against the City. Rogers testified that Lubke simply told him that he was retired from the City. Based on the testimony at trial and the Court's viewing of the witnesses, the Court finds as fact that Lubke did not tell Rogers that he retired from the City of Arlington, but that he had been wrongfully terminated in violation of the FMLA. The Court further finds that Lubke did in fact tell Rogers about the judgment against the City. The evidence is unclear, however, as to whether Rogers advised Lubke that he did not need to disclose the judgment unless Lubke actually received any money, or, whether Rogers simply was not paying attention. The evidence showed that Rogers's practice was a "volume business" and that he did not spend much time with Lubke. His lawfirm did not take care in ensuring that the Lubkes understood all of the terms in the bankruptcy forms or that the forms had been properly filled out. In fact, throughout the Lubkes' entire bankruptcy process, they spent less than forty-five minutes speaking with Rogers and one other attorney in his office.

The City filed a petition for a rehearing before the court of appeals two days prior to Reed's acceptance of the City's offer. When it learned of Lubke's bankruptcy from Reed's acceptance of its Rule 68 offer of judgment, the City sought leave from the court of appeals to raise the issue of Lubke's bankruptcy and to argue that his claim should be judicially estopped.

Reed filed a complaint with the bankruptcy court to revoke Lubke's discharge. The Lubkes answered and later agreed with Reed to a judgment revoking the bankruptcy discharge. At a hearing before the bankruptcy court, the bankruptcy judge informed the Lubkes that their discharge was going to be revoked. She specifically informed the Lubkes that "they won't receive a Chapter 7 discharge in this bankruptcy case" and that "losing a discharge is sort of losing the whole purpose of the bankruptcy filing." (Def.'s App. at 167.) Despite those consequences, the Lubkes still agreed to a judgment revoking their discharge.

On December 19, 2006, the court of appeals denied the City's petition for a rehearing. The court of appeals then issued its mandate directing this Court to "determine in the first instance, with an evidentiary hearing if necessary, whether judicial estoppel applies." *Lubke v. City of Arlington,* 473 F.3d 571 (5th Cir. 2006)(order denying petition for rehearing). Thereafter, the parties filed their respective pleadings on this issue and the Court held a hearing on February 14 and 15, 2008.

II. Analysis

   A.   Judicial Estoppel

   Judicial estoppel is a judicially created "equitable doctrine invoked by a court at its discretion." *Maine v. New Hampshire,* 532 U.S. 742, 749 (2001)(internal quotations and citations omitted). In its most basic form, the doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Id.* Its purpose is "to protect the integrity of the judicial process" by "preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *In the Matter of: Coastal Plains, Inc.,* 179 F.3d 197, 205-6 (5th Cir. 1999).

   Judicial estoppel is generally applied to prevent a party from gaining an unfair advantage or imposing an unfair detriment on an opposing party through the "improper use of judicial machinery." *New Hampshire,* 532 U.S. at 750-1; *Costal Plains,* 179 F.3d at 206. But because the doctrine's purpose is to protect the judicial system, detrimental reliance on the part of the opponent of the party against whom the doctrine is applied is not required. *Coastal Plains,* 179 F.3d at 210.

   Generally, judicial estoppel has two elements. First, a party may be judicially estopped only when that party has assumed a

position before one court that is clearly inconsistent with a position that party took before another court. *Coastal Plains,* 179 F.3d at 205. Second, the party must have convinced one of the courts to accept the inconsistent position. *Id.* at 206. Courts apply these two elements to determine whether judicial acceptance of an inconsistent position "would create the perception that either the first or second court was misled." *New Hampshire,* 532 U.S. at 750 (internal quotations and citations omitted). When judicial estoppel is raised in the context of a bankruptcy case where a debtor has failed to disclose all of his assets, the Court applies a third, bankruptcy-related element. *See Jethroe v. Omnova Solutions, Inc.,* 412 F.3d 598, 600 (5th Cir. 2005); *In re Superior Crewboats, Inc.,* 274 F.3d 330 (5th Cir. 2004). This third element addresses the plaintiff-debtor's failure to disclose a cause of action and requires a determination as to whether the failure to disclose was inadvertent.

The three elements that make up judicial estoppel in the bankruptcy context are applied "against the backdrop of the bankruptcy system and the ends it seeks to achieve . . . ." *In re Coastal Plains,* 179 F.3d at 208. The purpose of judicially estopping a plaintiff from pursuing a claim he failed to disclose in his bankruptcy

> is that the *integrity of the bankruptcy system*
> *depends on full and honest disclosure by*
> *debtors of all of their assets.* The courts
> will not permit a debtor to obtain relief from

> the bankruptcy court by representing that no
> claims exist and then subsequently to assert
> those claims for his own benefit in a separate
> proceeding. *The interests of both the credi-*
> *tors, who plan their actions . . . on the*
> *basis of information supplied in the disclo-*
> *sure statements, and the bankruptcy court,*
> *which must decide whether to approve the plan*
> *of reorganization* [or approve a no-asset
> discharge] *on the same basis, are impaired*
> *when the disclosure provided by the debtor is*
> *incomplete.*

*Id.* (emphasis in original)(internal quotations and citations omitted). "A major goal of bankruptcy is to provide debtors [with] a 'fresh-start' in life by furnishing a way to obtain relief from their debts." *In re Arnold,* 869 F.2d 240, 242 (4th Cir. 1989). One way this is accomplished is by allowing a debtor to obtain a discharge from his creditors in return for all of the debtor's assets (except for assets that are exempt) regardless of whether the assets are sufficient to cover the debtor's liabilities. But when a debtor conceals a potentially lucrative cause of action, judicial estoppel steps in to prevent the debtor from gaming the bankruptcy system so he can "get rid of [his] creditors on the cheap, and start over with a bundle of rights." *In re Coastal Plains,* 179 F.3d at 213 (internal quotations and citations omitted). Such conduct is an abuse of the bankruptcy process, and judicial estoppel was invented by the courts to protect against just such abuses. *See Id.* ("Again, the purpose of judicial estoppel is to protect the integrity of courts, not to punish adversaries or to protect litigants.").

B.   Application

1.   Inconsistent Positions

There is little question that here the first element of judicial estoppel is present.  The record shows that Lubke received a judgment in excess of one million dollars from this Court on May 13, 2004.   That judgment was appealed by the City and Lubke continued to defend that judgment before the court of appeals.  Such conduct is tantamount to a position before this Court and the court of appeals that he possessed a valid legal judgment against the City.   But when Lubke filed for bankruptcy under Chapter 7 on June 10, 2005, he failed to disclose this judgment to the bankruptcy court.   Therefore, Lubke represented to the bankruptcy court that no such judgment existed.  *See In re Superior Crewboats,* 374 F.3d at 335.

Reed argues that this element has not been met because she has not taken any inconsistent positions.   But judicial estoppel in the context of a bankruptcy debtor who has failed to be forthright in disclosing his assets is based on the debtor's conduct at the time of filing for bankruptcy.   "It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy **debtors** an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims*."  *Costal Plains,* 179 F.3d at 207-08 (bold emphasis added, italics emphasis in original).   While Reed's argument is certainly pivotal to the question as to whether

she or the bankruptcy estate should be estopped, it has no bearing on deciding whether the test for judicial estoppel has been met in the first instance. If the Court only focused on the trustee's conduct, then judicial estoppel could never be applied in circumstances like these because it is the debtor's responsibility to disclose all of his assets when he files for bankruptcy, not the trustee's.

Reed further argues that this element has not been met because Lubke's inconsistent position before the bankruptcy court came after he had filed his suit against the City and after he had won his judgment. But the order of Lubke's inconsistencies is immaterial, at least under these circumstances, because the advantage gained by Lubke doesn't change. Lubke's failing to disclose his judgment to the bankruptcy court while at the same time defending it before the court of appeals still placed Lubke in a position of benefitting from a bankruptcy discharge while standing in line to receive substantial funds from his judgment against the City. Thus, the Court concludes that the first element of judicial estoppel has been established.

## 2. Acceptance Of Inconsistent Positions

The second element of judicial estoppel is also present. After reviewing Lubke's disclosed assets, which excluded the judgment against the City, the bankruptcy court granted Lubke a no-

asset discharge. Reed argues that this did not amount to accep-
tance by the bankruptcy court because the court later reopened the
bankruptcy and revoked Lubke's discharge. Lubke's subsequent
disclosure, however, does not obviate the bankruptcy court's
original acceptance of Lubke's position that no judgment existed
and that he had no assets for distribution. At best, the reopening
of his bankruptcy case and the revocation of his discharge is
evidence that the bankruptcy court accepted Lubke's later position
that he failed to disclose an asset that he should have disclosed
when he first filed for bankruptcy. The fact that the bankruptcy
code allows for the reopening of a bankruptcy so that an unsched-
uled asset of the bankruptcy estate can be distributed does not
change the fact that the bankruptcy court had originally accepted
the position that no such asset existed. It is relevant, however,
as to whether the bankruptcy estate should be estopped from
pursuing and collecting on the judgment.


        3.   Inadvertence

    The third element is troubling for the Court, though the Court
concludes that it, too, is present. The Fifth Circuit has held
that a "debtor's failure to satisfy its statutory disclosure duty
is 'inadvertent' only when, **in general**, the debtor either lacks
knowledge of the undisclosed claims *or* has no motive for their
concealment." *Costal Plains,* 179 F.3d at 210 (italics emphasis in

original, bold emphasis added).  The use of "in general" connotes
that this is not an inflexible formula for determining whether a
debtor's failure to disclose was inadvertent.  This is important
because, while the combination of knowledge and motive may give
rise to an inference that the failure to disclose was not inadver-
tent, it does not conclusively support such an inference.  The use
of "in general" recognizes that evidence of knowledge and motive is
circumstantial regarding inadvertence and thus, necessarily
recognizes that other factors and evidence may still inform a
court's decision.  Indeed, the Supreme Court has stressed that
there are not "inflexible prerequisites or an exhaustive formula
for determining the applicability of judicial estoppel."  *Maine,*
532 U.S. at 751.

Thus, the Court concludes that when it has been shown (1) that
a debtor had knowledge of a claim or judgment at the time he filed
for bankruptcy; (2) that he failed to disclose the claim or
judgment to the bankruptcy court; and (3) that he had motive to
conceal it from the bankruptcy court, a presumption arises that the
debtor's failure to disclose the claim or judgment to the bank-
ruptcy court was not inadvertent.  That presumption, however, is
rebuttable, and additional or different factors and other evidence
may still be presented by the debtor to rebut the presumption.

Because, however, the integrity of the bankruptcy system
depends on the full and honest disclosure by a debtor of all of his

assets, a debtor must bear a significant burden in demonstrating that notwithstanding his knowledge and motive, his failure to disclose was inadvertent. Having knowledge of a claim or judgment and having a motive to conceal it from the bankruptcy estate creates a strong presumption——especially in light of the potential windfall that may befall the debtor——that the debtor's omission was not inadvertent. Thus, the Court concludes that the presumption can only be rebutted with clear and convincing evidence. Here, although a close call, the Court concludes that Lubke has failed to meet that burden.

There can be no dispute that Lubke had knowledge of his judgment when he filed for bankruptcy. There also can be no dispute that Lubke had a motive to conceal it from the bankruptcy court. Lubke's bankruptcy schedules revealed a total debt $459,821.46, of which $308,075.46 was owed to unsecured creditors. By failing to disclose his million-dollar judgment, Lubke was able to receive a no-asset discharge from his unsecured creditors.

The record, however, is far from conclusive on whether Lubke truly intended to conceal his judgment from the bankruptcy court or whether its omission was inadvertent. Lubke did inform Rogers of the judgment. He also told Rogers that the City had wrongfully terminated him under the FMLA. That should have alerted Rogers to further investigate what needed to be disclosed to the bankruptcy

court.[6]

The record also shows that Rogers's lawfirm was careless in ensuring that the Lubkes' schedules were filled out properly. The impression left with the Court was that Rogers engaged in a volume practice and was more focused on filing and completing as many bankruptcies possible without spending an unremunerative amount of time on them. The Court was left with the impression that Rogers was not terribly concerned with whether bankruptcy was the better course for his clients. The Court does not believe that Rogers or members and employees of his lawfirm exercised diligence in ensuring that debtors understood what needed to be disclosed or the ramifications of omitting something.

Moreover, the bankruptcy forms are of little assistance to the untrained eye. The schedule of assets directs the debtor to list any "contingent and unliquidated claims of any nature." (Pl.'s Ex. 5 at 6.) It does not define what a contingent and unliquidated claim entails, although it does state that the term includes tax refunds, counterclaims, and rights to setoff. The forms also require the debtor to "list all suits and administrative proceed-

---

[6]   The Court also believes the testimony of the Lubkes' daughter, Holly Nicole Lubke. She told the Court that when Lubke met with Rogers and decided to file for bankruptcy, Lubke tried to include approximately $20,000 in debt owed by her that he had co-signed. Rogers informed Lubke that the debt could not be included but recommended that he have his daughter see him. Nicole Lubke said that when she went to see Rogers, he told her that bankruptcy was created for people like her. Lubke recounted hearing the same line from Rogers and the Court is under the impression that Rogers used this canned line routinely. Nicole Lubke also testified that during the course of their conversations regarding her filing for bankruptcy, she told him and others in his office that Lubke had sued the City of Arlington and had a judgment.

ings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy." (*Id.* at 30.) The forms do not define what is meant by "suits" nor does it explain that "suits" include not only trials or lawsuits in a trial court, but appeals as well.

Probably most troubling to a finding that Lubke's failure to disclose was not inadvertent is the fact that Lubke came forward on his own volition. It is only because Lubke came forward that the bankruptcy court learned of this unscheduled asset. It is only because Lubke came forward that Reed was able to have Lubke's bankruptcy reopened, his discharge revoked, and step into this litigation in the hopes of collecting on the judgment for distribution to Lubke's creditors. And it is only because Lubke came forward that the City even became aware that he had previously filed for bankruptcy but failed to disclose his judgment to the bankruptcy court.[7]

These facts stand in stark contrast to those in the cases of *Superior Crewboats, Jethroe, and Kamont v. West,* 83 Fed. Appx. 1 (5th Cir. 2003), where the debtors were judicially estopped from pursing their claims. In all three cases, the debtors not only failed to disclose their causes of action to the bankruptcy court, they only sought to take remedial action for their failure to

---

[7] On that, the Court notes that Lubke could have first accepted the City's offer of judgment and then, after receiving the funds, turned them over to his bankruptcy estate. If Lubke had done that, the Court doubts that the City ever would have learned of Lubke's bankruptcy.

disclose after facing a motion to dismiss their cases on the basis of judicial estoppel. "Allowing [the debtor] to back-up, reopen the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing personal assets only if he is caught concealing them." *In re Superior Crewboats,* 374 F.3d at 336 (internal quotations and citations omitted). Here, Lubke took all the remedial measures he could before being faced with the judicial-estoppel motion from the City. He just as easily could have continued to conceal his bankruptcy from the City, accepted its offer, and then either made his disclosure to the bankruptcy court or continued to conceal the asset. There is much wisdom in a rule that does not award a debtor for taking remedial action only after being caught. But a rule that equally penalizes a debtor for taking appropriate remedial action on his own volition suggests that the debtor would be better off remaining silent and hope for the best. There is little wisdom in such a rule.

On the other hand, the record revealed that Lubke is not completely unsophisticated. He graduated with a bachelor's degree in science, and Lubke admitted to taking marketing and business courses in college. Lubke also opened and operated his own businesses. He was capable of registering certain trade names and applying for tax identification numbers from the state. One can expect such an individual to understand terms such as contingent

17

and unliquidated claims.

The record also revealed that just like the lawfirm Lubke employed, Lubke himself did not take great care or exercise diligence in filling out the bankruptcy forms. Although he claimed that he did not know what many of the terms meant on the various forms, he never cared to ask his bankruptcy attorney or anyone from the lawfirm to explain the terms to him. He also claimed that when he was handed the typed, finished version of his bankruptcy forms, he did not read through them carefully before signing them.

Lubke was at the very least negligent in his disclosures. He testified that there were a number of places on his forms where, although he understood what information the form sought, he failed to provide such information.[8] And even after reopening his bankruptcy and submitting amended schedules, the only correction he made regarded this lawsuit and judgment. He still failed to carefully review his disclosures to ensure that, this time around, it would be completely accurate. This allowed his other previous omissions to remain. Such carelessness cannot be countenanced.

Even more troubling to a finding of inadvertence is the fact that, despite having a nearly fifteen-year relationship with his attorney——Hurlbut——Lubke did not consult him about his bankruptcy

---

[8] For example, Lubke testified that he understood what trade names meant but that he failed to list all of the trade names he and his wife had used. He also understood what a lease was and admitted that he failed to disclose his oil-and-gas lease. And he admitted that he understood he was required to list all businesses he and his wife had owned within the past six years preceding his bankruptcy but that he failed to disclose at least two businesses.

before filing.  The decision to file for bankruptcy is significant and, although Lubke may not have understood all of the nuances of bankruptcy, the Court is convinced that Lubke understood that filing for bankruptcy was a very serious matter.  Yet after receiving advice from Rogers, an attorney Lubke had never met before and about whom Lubke complains as being cursory with him, Lubke did not care to consult Hurlbut.

Finally, although Lubke did disclose this lawsuit and judgment before being faced with a judicial-estoppel motion from the City, Lubke did not tell Hurlbut about his bankruptcy because he felt any obligation to do so.  Rather, the record reveals that Lubke's initial revelation came as an off-the-cuff comment in the context of a discussion regarding the hardships Lubke had faced over the years while pursuing this case.  The Court believes that the subsequent disclosures to the bankruptcy court and trustee came at the insistence of Hurlbut once he learned that Lubke no longer had the authority to accept the City's offer and that Lubke's initial non-disclosure could have severe consequences.  The Court has no doubt that Lubke's disclosures to the bankruptcy court and trustee came at the advice and encouragement of Hurlbut, who informed Lubke that he needed to take immediate remedial steps else the judgment be lost.

Thus, the Court concludes that Lubke has failed to rebut by a preponderance, much less by clear and convincing evidence, that the

presumption that his failure to disclose this lawsuit and judgment against the City when he filed for Chapter 7 bankruptcy was not inadvertent. Consequently, the Court concludes that judicial estoppel is appropriate.

C.    Remedy

Having decided that the Court should invoke judicial estoppel, the next question deals with fashioning an appropriate remedy. The City argues that the only appropriate remedy is for the Court to judicially estop both Lubke and the bankruptcy estate from further pursuing this judgment or collecting on it. In other words, the City is asking the Court to dismiss this case and "enter a take-nothing judgment" in its favor. (Def.'s Br. at 25.)

There is support for the City's position. *See Coastal Plains,* 179 F.3d at 204 (reversing 5.2 million dollar judgment on basis of judicial estoppel and directing judgment in favor of defendant); *In re Superior Crewboats,* 374 F.3d at 336 (reversing, on interlocutory appeal, district court and remanding case with instructions to dismiss plaintiff's suit on basis of judicial estoppel); *Jethroe,* 412 F.3d at 599 (affirming summary judgment granted to defendant on grounds of judicial estoppel); *Kamont,* Fed. Appx. at 1 (affirming district court's dismissal of plaintiff's claims on basis of judicial estoppel). None of these cases hold, however, that complete dismissal of a claim is the exclusive remedy for judicial

estoppel.

As mentioned above, judicial estoppel is a court created equitable doctrine. Both the Supreme Court and the Court of Appeals for the Fifth Circuit have said that judicial estoppel may be invoked by the Court at its discretion. *Maine v. New Hampshire,* 532 U.S. 742, 749 (2001)(internal quotations and citations omitted); *In re Costal Plains,* 179 F.3d at 205. The Supreme Court has admonished that there are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Maine,* 532 U.S. at 751. And the high court stressed that courts are free to consider additional or different factors that "**may inform the doctrine's application in specific factual contexts**." *Id.* (emphasis added).

An equitable doctrine such as judicial estoppel supports an equitable remedy. Courts routinely enjoy wide discretion when fashioning an equitable remedy to achieve the goals of a particular equitable doctrine. Judicial estoppel was created by the courts for the particular purpose of protecting the integrity of the judicial process (or in this case the bankruptcy process), and courts must enjoy wide discretion in fashioning a remedy that achieves that objective. After all, even the City must concede that judicial estoppel is not used "to punish adversaries or to protect litigants." *In re Coastal Plains,* 179 F.3d at 213. Rather, judicial estoppel is a shield used by the courts to protect

21

the integrity of the judicial system; it is not a sword for use by litigants.

The Court disagrees with the City that "the Fifth Circuit has cabined the flexibility and discretion available to district courts." (Def.'s Br. at 18.) Indeed, the Fifth Circuit reversed a district court's dismissal of a discrimination case because the district court failed to consider "the impact of the dismissal" on third-party creditors in a bankruptcy. *Wieburg v. GTE Southwest Incorporated,* 272 F.3d 302, 308-09 (5th Cir. 2001). In that case, the district court had dismissed Wieburg's discrimination case under Federal Rule of Civil Procedure 17(a)[9] because she did not own the cause of action; the cause of action was owned by her bankruptcy estate.[10] *Wieburg,* 272 F.3d at 305. While the court of appeals agreed that Wieburg lacked standing to pursue her discrimination claims, it concluded that the district court abused its discretion in dismissing the action because:

> In dismissing the complaint and denying the motion to vacate, . . . it is unclear whether the district court considered the impact of the dismissal on Wieburg's creditors, who are owed approximately $40,000. Because the statute of limitations has expired, the trustee is precluded from asserting the discrimination claims in a subsequent action. Thus, the district court's dismissal of the action means

---

[9]  At the time, Rule 17(a) provided, "Every action shall be prosecuted in the name of the real party in interest."

[10]  During the discrimination suit, Wieburg had filed for Chapter 7 bankruptcy but failed to disclose the suit as an asset of the bankruptcy estate. *Wieburg,* 272 F.3d at 304.

> that the creditors will have no possibility of
> any recovery. Under these circumstances, . .
> . we believe that it was an abuse of discre-
> tion for the district court to dismiss the
> action without explaining why less drastic
> alternatives . . . were inappropriate.

*Id.* at 308-09.

The Court recognizes that *Wieburg* is not a judicial-estoppel case, despite the fact that the facts closely follow the typical judicial-estoppel case in the bankruptcy context.[11] That distinction, however, does not make it any less applicable. If a court, when dismissing an entire case based on Rule 17(a), is required to consider the effects that dismissal may have on third-party creditors, then surely a court, seeking to employ its equitable powers, not only can, but must consider any impact that equitable remedy may have on innocent third parties, especially third-party creditors in a bankruptcy. Therefore, the Court holds that when it has been determined that judicial estoppel is appropriate, a court must still proceed with caution and ensure that the equitable remedy fashioned is not contrary to law and that it avoids doing unnecessary harm to innocent third parties. *See e.g. In re Cheng,* 308 B.R. 448 (9th Cir. 2004).

Based on the factual circumstances and procedural posture of this case, the Court concludes that the City's proposed remedy is inappropriate and draconian. Thus, the challenge for the Court is

---

[11] It should be noted, however, that the *Wieburg* Court did cite to *Costal Plains.* 272 F.3d at 306.

to fashion a remedy that will protect the integrity of the bankruptcy system by ensuring maximum deterrence against debtors' concealing assets; that follows the law and does not act contrary to it; and that does not do inequity by punishing the innocent. In making this determination, "the rich lore of equitable principles cannot be ignored." *In re Cheng,* 308 B.R. at 459.

It is a fundamental maxim that equity must follow the law. 27A Am. Jur. 2d Equity § 113 (2007). "A court of equity has no more right than has a court of law to act on its own notion of what is right in a particular case . . . ." *Id.* at § 109. Thus, a court of equity is "bound by any explicit statute or directly applicable rule of law, regardless of its view of the equities. Equity courts cannot disregard, or in effect repeal, statutory and constitutional requirements and provisions." *Id.* In this case, estopping the bankruptcy estate from pursuing Lubke's judgment against the City would be contrary to the Bankruptcy Code.

The Court must take into account that the judgment is no longer Lubke's property; it is the property of the bankruptcy estate. Section 541 of the Bankruptcy Code provides for the creation of a bankruptcy estate upon commencement of a Chapter 7 bankruptcy. *See* 11 U.S.C. § 541. Lubke's judgment became property of the bankruptcy estate at the time he filed for bankruptcy regardless of the fact that he failed to disclose it. *See* 11 U.S.C. § 541(a)(1)(stating property of the estate includes "all

legal and equitable interests of the debtor in property as of the commencement of the case"); *Costal Plains,* 179 F.3d at 207-08 (assets include all contingent and unliquidated claims such as causes of action).

Property of the bankruptcy estate remains property of the estate until it is either administered or abandoned under the terms of the Bankruptcy Code. *See* 11 U.S.C. § 554. Again, this is so even if the property was not listed on schedules or otherwise disclosed to the bankruptcy court. *Id.* Property of the estate that is not disclosed or otherwise administered by the time the bankruptcy case is closed remains property of the estate forever. *See* 11 U.S.C. § 554(c) and (d); *Jeffrey v. Desmond,* 70 F.3d 183, 186 n.3 (1st Cir. 1995)("any asset not properly scheduled remains property of the bankrupt estate, and the debtor loses all rights to enforce it in his own name"); *Vreugdenhill v. Navistar International Transportation Corp.,* 950 F.2d 524, 525 (8th Cir. 1991)(cause of action not formally listed on bankruptcy schedules remains property of bankruptcy estate even after bankruptcy is closed). And as long as that property remains in the bankruptcy estate, it continues to be protected by the automatic stay contained in the Bankruptcy Code. *See* 11 U.S.C. § 362(c)(1)("the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate").

The automatic stay bars any act seeking to obtain possession of or gain control over property of the bankruptcy estate. *See* 11 U.S.C. § 362(a)(3). The scope of the stay can extend to any proceeding that is related to a bankruptcy. *See In re S.I. Acquisitions, Inc.,* 817 F.2d 1142, 1147 (5th 1987). "A proceeding is related to a bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Bass v. Denney,* 171 F.3d 1016, 1022 (5th Cir. 1999). "The automatic stay thus imposes a moratorium on all actions against the debtor **or its property and assets**." *In re S.I. Acquisitions,* 817 F.2d at 1146. A primary purpose of the stay is to preserve the bankruptcy estate so as to ensure its equitable distribution to creditors through the bankruptcy. *Id.* at 1150.

Upon Lubke's filing of bankruptcy, the trustee became vested with the authority to continue to pursue the judgment against the City as an asset of the bankruptcy estate. *See* 11 U.S.C. § 323 (a) and (b)(the trustee is the representative of the bankruptcy estate and has authority to sue or be sued); *Wieburg,* 272 F.3d at 306. Under the bankruptcy rules, the trustee is permitted to prosecute any action or proceeding on behalf of the estate before any tribunal with or without the bankruptcy court's approval. *See* FED.R.BANKR.P. 6009. The trustee is required to "collect and reduce to money the property of the estate for which such trustee serves . . . ." 11 U.S.C. § 704(a)(1). And the Bankruptcy Code expressly

authorizes a case to be reopened to administer undisclosed assets. *See* 11 U.S.C. § 350(b).

Accepting the City's invitation to enter a take-nothing judgment in its favor would have a disastrous affect on the bankruptcy estate. And it would run counter to the provisions of the Bankruptcy Code. Congress, instead, provided for a stay of any action that could adversely affect the bankruptcy estate, and the Bankruptcy Code and Rules not only grant the trustee the authority to pursue the judgment against the City on behalf of the estate, it requires the trustee to do so. The Code also provides for the reopening of a bankruptcy to administer undisclosed assets of the bankruptcy estate. These mechanisms establish a clear preference for the preservation of the bankruptcy estate and for its equitable distribution to creditors through the bankruptcy process. "Equity is . . . said to follow both the letter and the spirit of the law, and courts of equity are said to be bound by principles of substantive law." 27A Am. Jur. 2d Equity § 113.[12]

---

[12] The Court recognizes that in *Coastal Plains,* the Fifth Circuit judicially estopped both the plaintiff and the trustee from pursuing claims against the defendant. That case is distinguishable from this case. The plaintiff in that case was not the debtor, Coastal Plains, but Industrial Clearinghouse ("IC"), a company formed by Coastal Plains' former CEO. IC gained ownership of Coastal Plains's claims against defendant Browning Manufacturing after they had been purchased at a foreclosure auction authorized by the bankruptcy court. The foreclosure auction came about after Coastal Plains and one of its secured creditors jointly moved the bankruptcy court to lift the automatic stay. The other creditors, including Browning who was also a creditor in the Coastal Plains bankruptcy, agreed to the lift of the stay and the foreclosure after Coastal Plains had represented that its claims against Browning were worthless and that its remaining assets were insufficient to satisfy the claims of the secured creditor making it highly unlikely that any of the unsecured creditors would receive any distributions from the bankruptcy estate. The foreclosure notice also failed to list Coastal Plains' claims against Browning as an asset available for purchase, though it was included among the foreclosure assets. After landing into IC's possession, it proceeded to assert

The evidence shows that nearly $56,000 in unsecured claims have been re-asserted against the bankruptcy estate since Lubke's bankruptcy has been reopened and notice was sent out.[13] Those creditors are entitled to an equitable distribution of the assets of the bankruptcy estate, which includes the judgment against the City, under the Bankruptcy Code. Judicially estopping the estate from further pursuing the judgment would render meaningless the creditors' statutory right to an equitable distribution of whatever is collected from the judgment against the City. Thus, it would be inappropriate for the Court to judicially estop the estate from pursuing and collecting on the judgment against the City. *See* 27A Am. Jur. 2d Equity § 111 ("a court of equity cannot . . . create a remedy in violation of law").

Another fundamental maxim in equity is that "a court of equity seeks to do justice, and not injustice." 27A A. Jur. 2d Equity § 110. Fashioning a remedy to implement judicial estoppel must be grounded in notions of fairness and preventing injustice for a court of equity will not "do inequity in the name of equity." *Id.* And it is a general maxim that "equity acts in personam." *Id.* at

---

them against Browning. IC and the bankruptcy trustee subsequently entered into an agreement where 85% of any judgment obtained would go to IC and 15% to the bankruptcy estate. Thus, judicially estopping the trustee and the bankruptcy estate was appropriate in that case because the bankruptcy estate stood to gain very little from the prosecution of Coastal Plains's claims against Browning. On the other hand, IC, which had been formed by Coastal Plains's CEO, stood to gain a windfall from Coastal Plains's failure to disclose the true nature of its assets and their value.

[13] Lubke's attorney, Roger Hurlbut, has also asserted unsecured claims totaling $449,000. Because he was unaware that Lubke had filed for bankruptcy, he could not have asserted those claims prior to the bankruptcy's being reopened.

§ 112.

Entering a take-nothing judgment in favor of the City reeks of doing injustice in the name of equity. There is no getting around the fact that creditors of the bankruptcy estate would be harmed.[14] At the same time, estopping the estate would transfer a windfall to the City. The City had its day in court, and a jury concluded that it violated the FMLA. Lubke's non-disclosure did not give him or the bankruptcy estate an unfair advantage over or impose any unfair detriment on the City. *See New Hampshire,* 532 U.S. at 751 ("A third consideration is whether the party . . . would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."). Thus, the City is no more entitled to a take-nothing judgment than the creditors are obligated to lose an opportunity to receive an equitable distribution from the bank-ruptcy estate.

Moreover, while estopping the estate may reach Lubke, its direct impact is on the bankruptcy estate. Thus, at best, estopping the estate would be acting both *in rem* and *in personam.* To put it more accurately, the Court would be acting *in rem* in estopping the estate as a means to achieve an *in personam* result:

---

[14] It could be argued that judicially estopping the bankruptcy estate would not make the creditors any worse off than when Lubke received his no-asset discharge. But that argument puts the cart before the horse. The bankruptcy court issued its no-asset discharge without knowledge of the pending judgment. Nevertheless, that does not change the fact that the judgment was and is property of the bankruptcy estate subject to equitable distribution to all creditors of the estate. In light of the Bankruptcy Code's express provisions allowing for the reopening of a bankruptcy to administer undisclosed assets, it is clear that the creditors of the bankruptcy estate would be harmed if the estate were estopped from pursuing and collecting on this judgment.

preventing Lubke from collecting on the judgment. As will be discussed below, there is an alternative remedy that achieves an *in personam* result but that does not require the Court to act *in rem*.

Finally, "it is an established maxim that equity will not suffer a wrong to be without a remedy . . . . Any situation that is contrary to equitable principles, and that can be redressed within the scope of a judicial action, may have a remedy devised to meet it, even though no similar relief has ever been given." *Id.* at § 111. Equity has suffered a wrong. Lubke's failure to disclose his judgment to the bankruptcy court misled his creditors as to the true value of his estate and misled the bankruptcy court into believing that a no-asset discharge was appropriate. Indeed, the notice sent to Lubke's creditors informed them that they did not need to file any claims because it was anticipated that there would be no assets for distribution. Undoubtedly, this caused many of Lubke's creditors to write off their claims. Support may be found in the fact that after an amended notice was sent out informing the creditors that an asset had been recovered, many have not asserted any claims.

Some relief has already been provided. Lubke's bankruptcy has been reopened and his discharge revoked. It is also nearly certain that Lubke will not be granted another discharge, thereby stripping him of all the benefits and protections offered by the Bankruptcy Code. And some of Lubke's creditors have asserted claims. But

that relief is far from complete because Lubke still stands to benefit from the failure of some creditors to assert claims they might have asserted had the judgment been promptly and properly disclosed.

Therefore, taking into account the maxims discussed above, the Court concludes that the following remedy is appropriate: Lubke is estopped from collecting or receiving any money from the judgment against the City. The bankruptcy estate, however, is not estopped from pursuing or collecting on the judgment against the City. Any funds collected from the judgment shall go to the bankruptcy estate for administration and distribution in accordance with the Bankruptcy Code and Rules. Any remaining funds after distribution shall be refunded to the City and not to Lubke.[15]

The Court concludes that this remedy adequately safeguards the integrity of the bankruptcy process while avoiding harm to innocent third-party creditors and transferring a windfall to an undeserving party. The equitable remedy fashioned by the Court acts *in personam* as it only affects Lubke. The remedy sends the message to debtors that their failure to make complete and accurate disclo-sures of their assets to the bankruptcy court will carry severe

---

[15] The Court notes that, in August 2006, the bankruptcy court sent a new notice to Lubke's creditors. The notice referred to a previous notice that had been sent to the creditors informing them that were "no apparent assets" and thus no need to file any proof of claims. The new notice informs the creditors that "assets have been recovered from which it appears that payment to creditors may be possible." In light of the fact that this notice fails to describe the asset recovered or its worth, the Court believes that a subsequent notice informing the creditors that the recovered asset is a judgment against the City of Arlington may be appropriate. The Court, however, will leave that to the discretion of the bankruptcy court.

consequences.  But this remedy does not act *in rem*, it does not act contrary to the letter and spirit of the Bankruptcy Code, and it does not do inequity in the name of equity.

III. Conclusion

For the reasons stated above, the City of Arlington's motion to dismiss is PARTIALLY GRANTED AND PARTIALLY DENIED.

SIGNED February 29, 2008.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE